**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANTS:

**T. MICHAEL CARTER**
Scottsburg, Indiana

ATTORNEYS FOR APPELLEE:

**CHRISTA L. WEST**
Department of Child Services
Scottsburg, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF K.C., R.C., and B.C., Minor Children, and )
)
)
)
R.C., Father, )
)
    Appellant-Respondent, )
)
        vs. )    No. 72A01-1301-JT-35
)
INDIANA DEPARTMENT OF CHILD SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE SCOTT CIRCUIT COURT
The Honorable Roger L. Duvall, Judge
Cause Nos. 72C01-1202-JT-1, 72C01-1202-JT-2, 72C01-1202-JT-3

**September 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

Ro.C. (Father) appeals the involuntary termination of his parental rights to K.C., R.C., and B.C. (collectively, "the children"). We affirm.

## FACTS AND PROCEDURAL HISTORY

Father and S.C. (Mother)[1] were the parents of three children: K.C., born May 5, 1998; R.C., born January 14, 2002; and B.C., born August 22, 2008. On November 4, 2010, the juvenile court adjudicated the children as Children in Need of Services (CHINS) based on an investigation that commenced September 17, 2010, approximately two weeks after Father began a three year prison term. During that investigation, DCS discovered the children had medical and educational issues and Mother was unable to care for them due to her drug use. Father did not object to the CHINS adjudication.

As part of its CHINS disposition, the juvenile court ordered Father to participate in parenting classes, substance abuse classes, and vocational rehabilitation if those programs were available in the facility where Father was incarcerated. During his incarceration, Father completed his GED and the Literacy Life Skills Program. Father began substance abuse treatment, but was unable to complete the program after he was transferred to a different correctional facility due to medical issues.

Father was released from incarceration on August 19, 2012. On September 10, 2012, Father participated in a Child and Family Team meeting and agreed to submit to random drug screens. His drug screen that day was positive for methamphetamine. Thereafter, Father attended four supervised visitation sessions with his children on September 17, September

---

[1] Mother voluntarily relinquished her rights to the children and does not participate in this appeal.

24, October 1, and October 11. After two of those visits, Father tested positive for drugs. On October 4, after a hearing on the CHINS matter, Father again tested positive for methamphetamine.

On October 18, the juvenile court held an evidentiary hearing on the involuntary termination of Father's parental rights to children. Father admitted he had relapsed into drug use after his release from prison and the children's therapist testified Father told her dealing drugs "provided for his family" and he "did not feel [it] actually harmed the children." (Tr. at 68.) On December 13, 2012, the juvenile court terminated Father's parental rights.

## DISCUSSION AND DECISION

We review termination of parental rights with great deference. *In re K.S., D.S., and B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge witnesses credibility. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine first whether the evidence supports the findings and second whether the findings support the judgment. *Id.* "Findings are clearly

3

erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A juvenile court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

To terminate a parent-child relationship in Indiana, the State must allege and prove:

(A)    that one (1) of the following is true:
  (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.
  (ii)   A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
  (iii)  The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)    that one (1) of the following is true:
  (i)    There is a reasonable probability that the conditions that

4

resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

  (C)    that termination is in the best interests of the child; and

  (D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

Because our legislature wrote subsection (B) in the disjunctive, a trial court needs to find only one of the three requirements established by clear and convincing evidence before terminating parental rights. *See L.S.*, 717 N.E.2d at 209. Here, the court found a reasonable probability the conditions resulting in the children's removal and continued placement outside of Father's care will not be remedied.[2]

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. It must evaluate the parent's habitual patterns of conduct to determine whether there is a

---

[2] Father also challenges the trial court's finding the continuation of the parent-child relationship posed a threat to the well-being of the children pursuant to Ind. Code § 31-35-2-4(b)(2)(B)(ii). As we hold DCS presented sufficient evidence there was a reasonable possibility the conditions under which the children were removed would not be remedied, we need not address that argument. *See In re L.S.*, 717 N.E.2d at 209 (stating Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive).

5

substantial probability of future neglect or deprivation. *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also properly consider, as evidence of whether conditions will be remedied, the services offered to the parent by DCS, and the parent's response to those services. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).

Regarding whether the conditions which resulted in the children's removal would not be remedied, the juvenile court found:

> 13. The current involvement by DCS [with] the children and the Mother and the Father began in the fall of 2010. At the time of the initial removal of the children from the care of the Mother, the Father was incarcerated for charges in Scott County for a Class B Felony charge of Dealing in a Controlled Substance, having been sentenced for a 6 year term of imprisonment. While it may be argued that the conditions that led to the removal of the children are attributable to the Mother, the conclusion and finding of the Court is that the Father's involvement in criminal drug activity is a part of the totality of circumstances concerning the parents' lack of care of their children. Additionally, the Father was released on bond and with the family until the date of sentencing, just two weeks before the removal of the children from Mother's care.
> 14. The Father remained incarcerated until August 18, 2012. There was no visitation arranged by DCS between Father and the children although Father requested that visitation. No services were formally offered although Father was encouraged to seek services while incarcerated. To that goal, while incarcerated the Father completed his GED, a Literacy Life Skills Program and began a substance abuse treatment program but was unable to complete that

program after being transferred to a different Department of Correction facility as a result of medical issues. There is no evidence before the Court that the Father undertook any steps to communicate to his children through letters.

* * * * *

18. While the lack of a record to arrange services for the Father during his incarceration may be troublesome, the Court finds more troublesome the actions of the Father following his release from incarceration and his attitudes concerning the reasons for his incarceration.

19. The Father was incarcerated for 2 ½ years when presumably he would have been in a drug[-]free environment. Upon his release a family team meeting was arranged on September 10, 2012. The Father was 45 minutes late for that meeting. A visit with the children was arranged on September 17 and he was 14 ½ minutes late for that visit. A second visit was arranged on September 24, 2012 and the Father was 10 minutes late for that visit after assuring the National Youth Advocate Program supervisor that he would be 20 minutes early.

20. The Father submitted to drug tests upon his release from incarceration. The test of September 10, 2012 indicated a methamphetamine level of 4584.1 ng/ml, and the test of September 24, 2012 indicated a methamphetamine level of 1144.5 ng/ml. These levels were testified to by the DCS witness, Bridget Lemberg as lethal for a "novice" user of the drug. The Father also tested positive for methamphetamine on September 17, 2012 and October 4, 2012 of 60.6 ng/ml. During these tests the Father also tested positive for amphetamine on 3 occasions and oxycodone on one occasion. The Father tested clean on October 1, 2012 and October 11, 2012.

21. As testified to by the children's therapist, Andrea Puckett, the Father conceded to her that the selling of drugs was justified as a means to provide for his family and did not feel that it was wrong. He further indicated to the therapist that he did not think selling the drugs affected his children.

22. For the Father to immediately re-engage in an illegal drug culture by abusing a destructive and dangerous drug such as methamphetamine after having been separated from his children for 2 ½ years and after experiencing the punitive effects of his past illegal activity by the State of Indiana with the 2 ½ years of incarceration; then the Court can only conclude that the conditions that led to the initial and prolonged separation of the Father from his children, namely illegal drug activity will not be remedied. Further given the significant recent drug use coupled with Father's past history, continuation of the parent child relationship poses a threat to the well being of the children.

(App. at 52-53.) Father argues DCS did not present sufficient evidence to support the

7

juvenile court's findings that there was a reasonable possibility that the conditions that resulted in the children's removal from her care would not be remedied, because DCS provided inadequate services to him prior to the involuntary termination of his parental rights. We are unable, however, to address the adequacy of the services offered to him prior to the involuntary termination of his parental rights because that issue is unavailable during an appeal following termination of parental rights. *See In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) ("failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law").

Father's additional arguments are invitations for us to reweigh the evidence, which we may not do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court does not reweigh evidence or judge credibility of witnesses). The evidence in the record supports the trial court's findings and judgment and, accordingly, we affirm.

Affirmed.

BAILEY, J., and BRADFORD, J., concur.